# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

NEW HAMPSHIRE DEMOCRATIC PARTY,
by RAYMOND BUCKLEY, CHAIR,
Plaintiff,

v.

Civil Action No. 1:17-CV-00396

WILLIAM M. GARDNER, in his official
capacity as the New Hampshire Secretary of
State; and GORDON MACDONALD, in his
official capacity as the New Hampshire
Attorney General,
Defendants.

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, New Hampshire Democratic Party, by its Chair, Raymond Buckley, and by and through counsel, Shaheen & Gordon, P.A., brings this Complaint for a declaratory judgment and preliminary and permanent injunction and state as follows:

## INTRODUCTION

1.      Historically, New Hampshire has had high voter turnout and virtually no voter fraud.  Nevertheless, the New Hampshire legislature (the "General Court") restricted access to the franchise under the guise of preventing voter fraud by enacting Senate Bill 3 (2017) ("SB 3"), which was signed into law by Governor Christopher Sununu on July 10, 2017. The enacted version of SB 3 is attached as Exhibit A.

2.      SB 3 imposes several brand new, highly confusing, unnecessary, and intimidating hurdles to voting. It will not only burden and, in some cases, disenfranchise eligible, lawful New Hampshire citizens, but will expose countless innocent voters to criminal and civil liability, not

for casting a ballot that they were ineligible to cast or for otherwise committing "voter fraud" as that term is typically understood, but simply for failing to understand or comply with confusing and burdensome paperwork requirements. SB 3 should be enjoined and declared unlawful under the New Hampshire Constitution.

3.      Among other things, SB 3 now requires all people seeking to register to vote to present documentary evidence of "a verifiable act or acts carrying out" their intent to be domiciled in New Hampshire. This ill-defined mandate means that potential voters who are otherwise eligible to vote based on age, citizenship, and domiciliary intent, must produce additional paperwork to "prove" that they do in fact intend to be domiciled where they register.

4.      Those who seek to register more than 30 days before Election Day who are unable to present such documentation, or for whom producing such documentation is unduly burdensome, will be denied their right to register. This is true even if these potential voters are legitimately domiciled in their town or ward and wholly qualified to vote.

5.      Those who attempt to register within 30 days of or on Election Day and are unable to present such documentation must complete different, lengthy registration forms that outline a deeply complicated domicile verification procedure. Despite the incomprehensibility of the forms, registrants must affirm, under penalties for voting fraud, that they understand the forms and are qualified to vote. They will be allowed to vote without presenting documentation, but they will face a double-edged sword. They must either swear they will present the required documentation shortly after Election Day (and be subject to hefty criminal and civil penalties if they do not) or swear they are not aware of the existence of any suitable documentary evidence (and expressly acknowledge that investigations to verify their domicile will result). They must choose one of these options, even if they are perfectly qualified to vote. If they do not choose one

of these options—neither of which is justified by the General Court's purported interest in combatting non-existent fraud—they will not be permitted to vote.

6.     The burdens fall disproportionately on New Hampshire's young, low-income, and minority groups and those who have recently moved within or into the state—all of whom are most likely to register close to or on Election Day—resulting in the arbitrary and differential treatment of similarly situated New Hampshire citizens. Indeed, the legislative history shows that SB 3 was passed with the purpose of suppressing the vote of young people—specifically, college students, who are more likely than others to have difficulty producing the requisite documentation in the time frames required, and thus will be most seriously harmed by the law.

7.     The confusing and cumbersome procedures that SB 3 now mandates will not just deter qualified potential voters from voting, but will also make it difficult for election officials to efficiently and timely register voters, further contributing to already long lines at polling places, which will make the burdens on those who seek to register using same day registration more severe. Those who are already registered but are simply attempting to vote will be similarly burdened by slow-moving lines.

8.     To protect themselves and thousands like them and/or their members and constituents from the denial or abridgment of their right to vote, Plaintiff seeks equitable relief pursuant to the New Hampshire Constitution, including a declaratory judgment that SB 3 is unconstitutional.

## **PLAINTIFF**

9.     Plaintiff NEW HAMPSHIRE DEMOCRATIC PARTY ("NHDP") is a political party as defined by N.H. RSA 652:11.  NHDP's address is 105 N. State Street, Concord, New Hampshire.  Raymond Buckley is the duly elected chairman of the New Hampshire Democratic

Party and is authorized to act on behalf of said party in this matter.  NHDP is comprised of New Hampshire citizens, voters, and elected officials who seek to associate; express their political views, nominate candidates for elective office who promote the official NHDP platform; run and vote in fair and open local, state, and federal elections; and work to promote the official NHDP platform in The City of Nashua, Hillsborough County, and throughout the State.  Among the issues on its official platform are:  (1) "Protecting the right of every eligible voter to vote;" (2) "Protecting the constitutional rights of all without discrimination;" and (3) "Preserving New Hampshire's First in the Nation Primary."  Specifically, NHDP seeks "to secure the right to vote and to broaden voter participation, not restrict it through voter identification laws or measures that are aimed at preventing students, the elderly, voters with disabilities, or minorities from exercising their constitutional right to vote.  Democrats believe that voting is a right and responsibility and not a privilege, and that every step should be taken to ensure that all eligible individuals vote in every election.  This means that registration must be made as easy as possible to include automatic registration and the continuation of same day registration. Polls must be safe and accessible. No eligible voter may be denied access to the polls, and every vote should be counted."  NHDP also works to "explore other options to expand voter access including 'no excuse' absentee voting."  The NHDP represents 276,817 registered voters in the State and, according to the April 11, 2017 checklist, 17,745 registered voters in Nashua Wards 1-9.  NHDP regularly engages in numerous voter education and participation activities across New Hampshire.   These include explaining voter eligibility and ID requirements and New Hampshire's voter registration procedures, and ensuring that New Hampshire local, state, and federal elections are conducted openly, fairly, and in accordance with the New Hampshire and United States Constitutions.  Unless SB 3 is declared unlawful and enjoined, thousands of NHDP

registered voters in Nashua and across the State, especially young, underprivileged, and transitory voters, as well as eligible but not yet registered voters, will be too intimidated by the complex, amorphous requirements of SB 3 to register or vote at all.  In the event that they attempt to register and vote subject to the requirements of SB 3, they will find themselves subject to substantial criminal and civil penalties or intrusive personal investigations should they fail to comply with the impossible requirements of SB 3.  College students, such as those studying at Nashua Community College, Rivier University, and Daniel Webster College, will be among those disproportionately affected.  The result will be that the constitutional rights of these registered and eligible but not yet registered NHDP voters will be unduly burdened or deprived entirely.  A further result will be that NHDP candidates and voters will be deprived of their constitutional right to run and vote in fair and open local, state, and federal elections.

## DEFENDANTS

10.     Defendant WILLIAM M. GARDNER is the New Hampshire Secretary of State (the "Secretary") and is named as a Defendant in his official capacity. He is the chief elections officer in charge of administering New Hampshire's election laws. RSA 652:23. This includes, but is not limited to, responsibility for publishing the elections manual and procedures for conducting elections, RSA 652:22, and for prescribing the voter registration form, RSA 654:7. The Secretary, personally and through the conduct of his employees and agents, acted under color of state law at all times relevant to this action.

11.     Defendant GORDON MACDONALD is the New Hampshire Attorney General and is named as a Defendant in his official capacity. He is authorized to impose and institute civil actions to collect civil penalties on individuals found liable for wrongful voting. RSA 659:34. He is also responsible for approving the elections manual and procedures for conducting

elections. RSA 652:22. Attorney General MacDonald, personally and through the conduct of his employees and agents, acted under color of state law at all times relevant to this action.

## JURISDICTION & VENUE

12.     This Court may lack subject matter jurisdiction to consider this matter, which only asserts claims under the New Hampshire Constitution against state officials. The federal courts' supplemental jurisdiction does not override the Eleventh Amendment's prohibition of claims against the state. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 120 (1984). To the extent that such constitutional bar is waivable, it has not clearly been waived by Defendants. A motion to remand this matter to the Superior Court of the State of New Hampshire will be filed shortly. The Superior Court of the State of New Hampshire has jurisdiction as the court of general jurisdiction in New Hampshire, RSA 491:7, and has jurisdiction to grant declaratory relief, RSA 491:22.

13.     The Superior Court of the State of New Hampshire has personal jurisdiction over Defendants, both of whom are sued in their official capacities and are elected or appointed officials in New Hampshire, and both of whom work and reside in the State of New Hampshire. RSA 510:2.

14.     Venue is proper in Hillsborough County. Plaintiff NHDP conducts voter education activities in this County, participates in local, state, and federal elections in this County, and has members, including 17,745 in Nashua Wards 1-9 alone, who reside in this County.   The fundamental constitutional rights of these members to vote would be unduly burdened or deprived if SB 3 were permitted to stand.   The constitutional rights of young voters, such as Nashua Community College, Rivier University, and Daniel Webster College students, disadvantaged voters, and other voters who belong to a transitory population, such as former

prison inmates and migrant workers would be particularly burdened. Furthermore, as Hillsborough County and the City of Nashua, in particular, have a high same-day voter registration rate, the impact of SB 3 would be especially injurious in this County.  . The violations complained of have harmed and will, if unchecked, continue to harm the rights of those members domiciled in this district. RSA 507:9.

### STATEMENT OF FACTS

15.    The New Hampshire Constitution guarantees that "[a]ll elections are to be free, and every inhabitant of the state of 18 years of age and upwards shall have an equal right to vote in any election." N.H. Const. Pt. 1, Art. 11. "Every person shall be considered an inhabitant for the purposes of voting in the town, ward, or unincorporated place where he has his domicile," and "[v]oting registration and polling places shall be easily accessible to all persons." *Id.* Thus, New Hampshire citizens who are 18 years or older have a constitutional right to vote where they are domiciled. *Id.*

16.    Since the election laws were first codified in 1979, the General Court has implemented the domicile qualification in three ways. First, it has proffered a statutory definition of domicile, which is codified in RSA 654:1 (Voter; Officeholder) and 654:2 (Temporary Absence). Second, it has set forth procedures to determine whether a potential voter meets the domicile qualification and may register to vote. These procedures are codified in RSA 654:7 (Voter Registration, Voter Registration Form) and RSA 654:12 (Determining Qualifications of Applicant). Third, it has defined the actions that constitute voter fraud and the penalties that a person is subjected to for committing voter fraud, which are codified in RSA 659:34 (Wrongful Voting; Penalties for Voter Fraud).

17.    With SB 3, the General Court has changed the definition of domicile, placed

additional procedural requirements on registrants to prove their domicile, and increased penalties for failing to meet those requirements. How these changes alter the laws that were in effect before the enactment of SB 3 is critical to understanding its burdensome impacts.

### Overview of Voter Registration Laws in New Hampshire Before SB 3

18.     RSA 654:1 defines domicile as "that one place where a person, more than any other place, has established a physical presence and manifests an intent to maintain a single continuous presence for domestic, social, and civil purposes relevant to participating in democratic self-government." While "a person has the right to change domicile at any time, . . . a mere intention to change domicile in the future does not, of itself, terminate an established domicile before the person actually moves." RSA 654:1, I. Also, "[a] student of any institution of learning may lawfully claim domicile for voting purposes in the New Hampshire town or city in which he or she lives while attending such institution of learning if such student's claim of domicile otherwise meets the requirements [above]." RSA 654:1, I-a.

19.     RSA 654:2 states that "[d]omicile for purposes of voting is a question of fact and intention." Further, "[a] domicile for voting purposes . . . shall not be interrupted or lost by a temporary absence therefrom with the intention of returning thereto as his or her domicile," and domicile, "once existing, continues to exist until another such domicile is gained." *Id.*

20.     New Hampshire is the only state in the entire country that requires in-person registration for most registrants. New Hampshire does not allow for registration by mail, except under the limited circumstances where an individual cannot register in person because of a disability, temporary absence, or military service.[1] SB 3 does not change the requirements for

---

[1] Individuals who are unable to register to vote in person due to a disability or temporary absence may register using an "Absentee Registration Affidavit" by which they submit documentation and attest to both their qualifications to vote and their domicile. RSA 654:16, 654:17. Individuals unable to register to vote in person due to military service may apply to register using the federal official post card prescribed under federal law. RSA 654:20.

proving domicile for any of these registrants.

21.    Otherwise, all qualified citizens must register: (1) in person at their local clerk's office during normal business hours, RSA 654:8; (2) in person with the Supervisors of the Checklist (the "Supervisors")[2] at a special session for correction of the voter checklist, which takes place six to thirteen days before Election Day, RSA 654:11, 654:27; or (3) in person at their polling place on Election Day (i.e., same day registration), RSA 654:7-a. If voters move to a new town or ward, they must also re-register in person.

22.    All registrants are required to fill out a "Voter Registration Form"[3] and provide reasonable documentation of identity, citizenship, and age. RSA 654:7 and 654:12, I(a), (b). If they do not have acceptable documentation in their possession when registering, they can attest to their identity, citizenship, and age, under the penalties for voting fraud, by filling out a "Qualified Voter Affidavit" (if they are registering before Election Day) or executing a "sworn statement" on the Voter Registration Form (if they are registering on Election Day). *Id.*

23.    Before the enactment of SB 3, all registrants were also required to provide reasonable documentation of domicile. RSA 654:12, I(c). This included any documentation "which indicates that the applicant has a domicile and intends to maintain a domicile" in New Hampshire. *Id.* Certain forms of documentation bearing the registrant's address—including a New Hampshire driver's license, resident vehicle registration, or federal photo ID—were presumptive evidence of domicile. RSA 654:12, II(a).

---

[2] The Supervisors manage New Hampshire's voter registration process. RSA 652:15. They are three individuals elected to serve a 6-year term in each New Hampshire town or ward. RSA 41:46-a. They manage all decisions on voter qualifications and additions to the voter "checklist." RSA 654:11.

[3] The voter registration forms for voters registering to vote prior to Election Day and those registering on Election Day were virtually identical before the enactment of SB 3. The only difference was that the Election Day form permitted applicants to complete a sworn statement, initialing next to boxes indicating that the form was executed for the purpose of proving identity, citizenship, age, and domicile. RSA 654:7, IV. This allowed Election Day registrants to avoid having to fill out a separate Qualified Voter Affidavit and a separate Domicile Affidavit (discussed *infra*), expediting the process on Election Day.

24.    Critically, however, and as with the other voter qualifications discussed in paragraph 24 above, if registrants did not have acceptable documentation of domicile when registering to vote, they could attest to their domicile under the penalties for voting fraud by filling out a "Domicile Affidavit" or a sworn statement on the Voter Registration Form. RSA 654:12, I(c). SB 3 eliminates the option of filling out a Domicile Affidavit or sworn statement.[4]

25.    RSA 659:34 set forth the acts that constituted "wrongful voting" prior to SB 3's passage, and the penalties for the same. A person was subject to a civil penalty up to $5,000 if they: (1) purposely or knowingly made a false material statement regarding their qualifications to vote when voting, registering to vote, or submitting registration forms or affidavits; (2) voted more than once for any office or measure; (3) applied for a ballot in a name other than their own; (4) applied for a ballot after they had voted; (5) voted when they were not qualified; (6) gave a false name or answer while under examination as to their qualifications to vote; or (7) presented falsified proof of identity. RSA 659:34, I. A person was guilty of a class B felony for "purposely or knowingly" voting more than once or when they were not qualified and a class A misdemeanor for "purposely or knowingly" committing any of the other acts. RSA 659:34, II.

26.    Under these laws, New Hampshire historically has had high voter turnout as compared to other states and virtually no instances of voter fraud.

### Overview of SB 3

27.    SB 3 (Chapter 205 of the 2017 Session Laws or "Ch. 205") amends one of the two statutes that define domicile (RSA 654:2) and both of the statutes that set forth procedures to determine whether a registrant meets the domicile requirement (RSA 654:7 and RSA 654:12).

---

[4] SB 3 does not change the responsibility of the Secretary to send a letter after an election to all voters who executed a Domicile Affidavit or sworn statement, informing them of driver's licensing and vehicle registration requirements. RSA 654:12, V(d). The Secretary is instructed to forward the names of persons for whom the letter is undeliverable to the Attorney General for further investigation into potential voting fraud. RSA 654:12, V(e).

SB 3 also amends the voter fraud and penalties statute (RSA 659:34), to add a penalty—not for any act that the average person would understand to be voter fraud under common sense—*but for failing to comply with an arbitrary and unnecessary paperwork requirement.*

> **i.    SB 3 Changes the Definition of Domicile to Require a "Verifiable Act" and Presumes That Those Who Recently Moved Are Not Domiciled**

28.    SB 3 adds a second clause to the sentence in RSA 654:2 so that it reads: "Domicile for purposes of voting is a question of fact and intention *coupled with a verifiable act or acts carrying out that intent.*" Ch. 205:1, I (emphasis added to reflect new language).

29.    SB 3 also adds a new defined term to the statutes: "temporary purposes." Ch. 205:1, II(a). Under the new law, those who are present in New Hampshire for temporary purposes do not gain a domicile for voting purposes and therefore cannot vote. *Id.* Those who have been residing in a town or ward for 30 or fewer days are "presumed to be present for temporary purposes," unless they prove they are domiciled. Ch. 205:1, II(b). Temporary purposes include, but are not limited to, being present in New Hampshire for 30 or fewer days for the purposes of tourism, visiting family and friends, performing short term work, or volunteering or working to influence voters in an upcoming election. Ch. 205:1, II(c).

> **ii.    SB 3 Imposes New Difficult Documentation Requirements**

30.    SB 3 requires all registrants to provide documentation proving they have taken a verifiable act carrying out their domiciliary intent. Ch. 205:1, II(d). It provides a non-exhaustive list of nine acts that, if documented, suffice to demonstrate that a registrant has an intent to be domiciled at the address where they seek to register to vote: (1) "residency" at an institution of higher learning; (2) renting or leasing an abode; (3) purchasing an abode; (4) obtaining a New Hampshire motor vehicle registration, driver's license, or ID; (5) enrolling a child in a public school; (6) identifying the address on a tax form or other government-issued ID or form; (7)

providing the street address to the U.S. Post Office as their permanent address; (8) obtaining public utility service at the address; or (9) arranging for a homeless shelter or similar service provider to receive mail. *Id*. If a registrant lives at an abode that is rented, leased, or owned by another, and the registrant's name is not listed on the rental agreement, lease, or deed, a written statement stating that the applicant resides at that address, signed by the owner or manager of the property under penalties for voting fraud (the "Landlord Affidavit"), can serve as acceptable documentation. Ch. 205:1, II(e). If a registrant has not taken one of the identified acts, the registrant may provide evidence of some other act if it "demonstrate[s] an intent to make a place his or her domicile." *Id.* The law is silent as to what other acts or documentation is sufficient.

31.    SB 3 gives little guidance on precisely what paperwork will suffice. *See* Ch. 205:1, II(d), (e). Thus, individual town and city clerks, Supervisors, and polling place workers will be tasked with not only understanding the requirements of SB 3, but also clearly communicating them to registrants, and determining—largely on a case by case basis—whether paperwork proffered satisfies SB 3. This subjective decision-making is virtually certain to lead to varied and inconsistent results across the state and even within a single town or ward.

### iii.    SB 3 Imposes New Confusing Domicile Verification Procedures

32.    SB 3 imposes a confusing domicile verification procedure for registrants and creates substantially different procedures for those who register more than 30 days before an election ("more than 30 days" registrants) and those who register within 30 days of or on Election Day ("within 30 days" registrants). *See* Ch. 205:5.

#### Domicile Verification Procedure for "More Than 30 Days" Registrants

33.    First, if a "more than 30 days" registrant has a state or federal photo ID, a government issued check, benefit statement, or tax document with their domicile address, they must present that document to prove domicile and register to vote. Ch. 205:5, I(c)(1)(A). A

registrant who has such a document, but does not bring it when seeking to register, cannot register unless or until they return and present the document. *Id.*

34.    Second, if a "more than 30 days" registrant attests, under penalty of voter fraud, they do not have a state or federal photo ID, a government issued check, benefit statement, or tax document with their domicile address, they may present "reasonable documentation" establishing "it is more likely than not" that they are domiciled and intend to remain in New Hampshire "at least until election day." Ch. 205:5, I(c)(1)(B). "[R]easonable documentation" may include "evidence of" the nine verifiable acts discussed in paragraph 32 above. A registrant who has such documentation, but does not bring it when seeking to register, cannot register unless or until they return and present the documentation. *See* Ch. 205:5, I(c)(1)(A).

35.    Third, if a "more than 30 days" registrant does not present documentation of domicile that a local election official deems acceptable, they cannot register. *See id.*

36.    SB 3 entirely eliminates the Domicile Affidavit as an option for "more than 30 days" registrants who take the time to go to their local clerk's office to register and who are domiciled in their town or ward and qualified to vote, but who do not bring paperwork that meets the standard under SB 3. *See* Ch. 205:5, I(c) (removing form for Domicile Affidavit).

37.    Notably, SB 3 does not alter the Qualified Voter Affidavit such that all registrants may continue to attest, under penalties for voting fraud, to their identity, citizenship, and age. *See* Ch. 205:5, I(a) (making no amendments to Qualified Voter Affidavit).

38.    SB 3 leaves the pre-election day Voter Registration Form, now applicable to "more than 30 days" registrants, largely unchanged. *See* Ch. 205:2, IV(b). The form provides no guidance as to what acts a registrant must take or what paperwork they must provide to register under SB 3's confusing new domicile requirements. Unless prospective voters are provided clear

instructions from election officials, read the language of SB 3 themselves, or are willing to make multiple trips to attempt to register, SB 3 is likely to leave many "more than 30 days" registrants confused and/or under the mistaken belief that they cannot register at all.

Domicile Verification Procedure for "Within 30 Days" Registrants

39.    While the "more than 30 days" verification procedure mandated by SB 3 is confusing enough, the process for those attempting to register to vote "within 30 days" of an election is even more so.

40.    If a "within 30 days" registrant has a state or federal photo ID, a government issued check, benefit statement, or tax document with their domicile address, or any "reasonable documentation" that is "evidence of" the nine verifiable acts discussed in paragraph 32 above, they must present it to register to vote. Ch. 205:5, I(c)(2)(A). If a "within 30 days" registrant does not present one of these types of documentation at the time of registration, they may only register and vote if they commit to using one of two post-election domicile verification options, hereinafter referred to as the "Document Production Option" and the "Investigation Option".

41.    The Document Production Option: If the registrant has any of the documentation described in paragraph 32 above, but does not bring it when registering, they must initial next to a paragraph on the Voter Registration Form acknowledging an obligation to present documentation to the local clerk within 10 days after the election (or 30 days, if the clerk's office is open 20 hours per week or less). *Id.*[5] If they fail to meet that deadline, their domicile will be verified by the Supervisors after the election, as discussed below in paragraph 57. Ch. 205:1, V. Although registrants are not informed of this when filling out the Voter Registration Form, they are also subject to civil and criminal penalties if they "knowingly or purposely" fail to provide the required documentation by the deadline. *See* Ch. 205:2, IV(c) and 205:5, I(c)(2)(A).

---

[5] The form does not inform the voter whether they are in a 10 or 30 day jurisdiction. Ch. 205:2, IV(b).

42.    <u>The Investigation Option:</u> If a "within 30 days" registrant has no acceptable documentation of domicile at all, the registrant may nonetheless register to vote by initialing next to a paragraph on the registration form acknowledging that their domicile may be verified by the Supervisors after the election, as discussed below in paragraph 57. Ch. 205:5, I(c)(2)(B).

43.    If a "within 30 days" registrant has no form of documentation described in paragraph 32 or is too confused or otherwise justifiably unable to choose either of the post-election verification options described above, they will not be permitted to register and vote.

44.    SB 3 eliminates the sworn statement as an option for same day registrants who are domiciled in New Hampshire and qualified to vote, but do not bring paperwork that meets SB 3's requirements when attempting to register. *See* Ch. 205:2, IV(c) (removing ability to swear as to domicile). As noted, SB 3 does not eliminate the sworn statement in its entirety; registrants may still attest under penalties for voting fraud to their identity, citizenship, and age. *See id.* (making no amendments to ability to swear as to identity, citizenship, and age).

45.    Those registering "within 30 days" of an election now must complete registration forms that SB 3 dramatically increased in length and complexity. *See* Ch. 205:2, IV(c), V.

46.    The "within 30 days" Voter Registration Form requires registrants to state—under penalties  of voting fraud—the precise date that they moved to the address they have provided as their domicile. Ch. 205:2, IV(c).

47.    The "within 30 days" Voter Registration Form also adds the following language setting out the Document Production Option and the Investigation Option for those who do not bring paperwork with them to register, *id.*:

> I understand that to make the address I have entered above my domicile for voting I must have an intent to make this the one place from which I participate in democratic self-government and must have acted to carry out that intent.
>
> I understand that if I have documentary evidence of my intent to be domiciled at

this address when registering to vote, I must either present it at the time of registration or I must place my initials next to the following paragraph and mail a copy or present the document at the town or city clerk's office within 10 days following the election (30 days in towns where the clerk's office is open fewer than 20 hours weekly).

_____ By placing my initials next to this paragraph, I am acknowledging that I have not presented evidence of actions carrying out my intent to be domiciled at this address, that I understand that I must mail or personally present to the clerk's office evidence of actions carrying out my intent within 10 days following the election (or 30 days in towns where the clerk's office is open fewer than 20 hours weekly), and that I have received the document produced by the secretary of state that describes the items that may be used as evidence of a verifiable action that establishes domicile.

Failing to report and provide evidence of a verifiable action will prompt official mail to be sent to your domicile address by the secretary of state to verify the validity of your claim to a voting domicile at this address.

I understand that if I do not have any documentary evidence of my intent to be domiciled at this address, I must place my initials next to the following paragraph:

_____ By placing my initials next to this paragraph, I am acknowledging that I am aware of no documentary evidence of actions carrying out my intent to be domiciled at this address, that I will not be mailing or delivering evidence to the clerk's office, and that I understand that officials will be sending mail to the address on this form or taking other actions to verify my domicile at this address.

48.     After that language on the Voter Registration Form, registrants must sign the form under the following statement, *id.* (emphasis in original):

I acknowledge <u>that I have read and understand the above qualifications</u> for voting and do hereby swear, under the penalties for voting fraud set forth below, that I am qualified to vote in the above-stated city/town, and, if registering on election day, that I have not voted and will not vote at any other polling place this election.

49.     The Voter Registration Form explains the criminal and civil penalties for providing false information when registering to vote and for voting in more than one state in the same election. *Id.* But it does not explain—anywhere—that registrants are subject to criminal and civil penalties if they "knowingly or purposely" fail to provide documentation by the deadline under the Document Production Option. *See id.* Also, the form does not explain the

extent of the investigations that will be performed to verify registrants' domicile addresses after Election Day, including that they may involve invasive home visits. *See id.*

50.    SB 3 also adds an addendum to the Voter Registration Form, the "Verifiable Action of Domicile Form." Ch. 205:2, V. This is the "document produced by the secretary of state that describes the items that may be used as evidence of a verifiable action that establishes domicile" to which the new "within 30 days" Voter Registration Form refers. It is supposed to be distributed to registrants who do not present documentary evidence when registering and "shall provide notice of the requirements that registrants must furnish documentary evidence of domicile." *Id.*[6]

51.    The Verifiable Action of Domicile Form states the following, *id.*:

As a newly registered voter, you have received this document because you did not provide proof of domicile when you registered to vote. RSA 654:2, IV requires you to provide evidence that you have taken a verifiable act to establish domicile.

The following checklist shall be used as a guide for what you may use as evidence and shall be submitted to the town or city clerk along with documentation that you are required to provide. Only one item on the list is required to demonstrate a verifiable act.

To establish that you have engaged in a verifiable act establishing domicile, provide evidence that you have done at least one of the following:

___ established residency, as set forth in RSA 654:1, I-a, at an institution of learning at the address on the voter registration form

___ rented or leased an abode, for a period of more than 30 days, to include time directly prior to an election day at the address listed on the voter registration form

---

[6] The Verifiable Action of Domicile Form is "to be distributed to those registrants who register within 30 days before the election or on Election Day and who do not provide proof of domicile or a verifiable action to demonstrate domicile." Ch. 205:2, V. That language indicates that the form will be given to anyone who doesn't have documentation, regardless of which option they choose. Yet, a registrant who chooses the Investigation Option explicitly indicates that they will not be providing any documentary evidence and is not asked to acknowledge receipt of the Verifiable Action of Domicile Form. *See* Ch. 205:2, IV(c). Thus, it is unclear who will ultimately receive the form and be required to follow its instructions.

___ purchased an abode at the address listed on the voter registration form

___ obtained a New Hampshire resident motor vehicle registration, driver's license, or identification card issued under RSA 260:21, RSA 260:21-a, or RSA 260:21-b listing the address on the voter registration form

___ enrolled a dependent minor child in a publicly funded elementary or secondary school which serves the town or ward of the address where the registrant resides, as listed on the voter registration form

Identified the address on the voter registration form as your physical residence address on:
___ state or federal tax forms

___ other government-issued forms or identification. Describe form of identification: _____

___ provided the address on the voter registration form to the United States Post Office as your permanent address, provided it is not a postal service or commercial post office box, where mail is delivered to your home. This can be by listing the address on the voter registration form as your new address on a Postal Service permanent change of address form and providing a copy of the receipt, or an online emailed receipt

___ obtained public utility services (electricity, cable, gas, water, etc.) for an indefinite period at the address on the voter registration form. List services obtained: _____

___ arranged for a homeless shelter or similar service provider to receive United States mail on your behalf.  Enter name of the shelter or provider: _____

___ describe what other verifiable action or actions you have taken to make the address listed on your voter registration form your one voting domicile: _____

If you have no other proof of a verifiable act establishing domicile, and your domicile is at an abode rented, leased, or purchased by another and your name is not listed on the rental agreement, lease, or deed, you are required to provide a written statement, signed under penalty of voting fraud if false information is provided, from a person who is listed on such document, or other reasonable proof of ownership or control of the property, attesting that you reside at that address, signed by that person or his or her agent who manages the property.

This verifiable action of domicile form, along with your written statement or other documentation proving a verifiable act, shall be delivered to the town or city clerk, by mail or in person, with 10 days, or within 30 days if the clerk's office is open fewer than 20 hours weekly.

52.    Registrants must fill out and sign the Verifiable Action of Domicile Form and submit it with documentation of their domicile by the deadline after the election. *Id.* Election officials will retain a copy of documentation provided and attach it to the Voter Registration Form. *See id.* and Ch. 205:5, I(c)(2)(A).[7]

53.    The Verifiable Action of Domicile Form, which registrants will take home with them after Election Day and refer to when attempting to provide documentation later, does not explain—anywhere—that if they fail to provide documentation by the deadline, their domicile addresses will be verified through investigations that may include officers visiting them at their homes and that they will be subject to criminal and civil penalties if they "knowingly or purposely" fail to provide documentation by the deadline. *See* Ch. 205:2, V.

### iv.    SB 3 Imposes Additional Post-Election Verification Procedures

54.    In addition to requiring election officials to make independent (and inevitably, arbitrary) judgment calls as to what documentation is sufficient to evidence that the registrant has undertaken a verifiable act of domicile, SB 3 imposes new obligations on the Supervisors to investigate and verify the domicile of those who do not present acceptable proof of domicile when they register to vote. Ch. 205:1, V. This includes both registrants who initialed the Investigation Option, as well as those who initialed the Document Production Option but failed to submit their documentation to the clerk's office by the deadline. *Id.*

55.    "As soon as practical following an election" the Supervisors must verify that a

---

[7] SB 3 explicitly provides that a copy of documentation provided by registrants after Election Day will be retained by election officials, but does not indicate whether election officials will also retain copies of documentation that registrants present before or on Election Day.

registrant was "domiciled at the address claimed on election day" by means including, but not limited to: (1) examining public records in a municipal office; (2) requesting two or more municipal, county, or state election officers or their agents "to visit the address and verify that the individual was domiciled there on election day"; or (3) referring the registrant's information to the Secretary, "who shall cause further investigation as is warranted." *Id.* SB 3 does not provide funding for these additional tasks, is silent as to how the Supervisors will accomplish them, and does not provide any guidance with respect to the process to be used for and extent of the visits that will be made to the homes of registrants.

56.     SB 3 requires the Supervisors to report to the Secretary any case in which they are either unable to verify domicile, or where evidence of voting fraud exists. Ch. 205:1, VI. If the Secretary confirms that a voter is not domiciled at the address provided, the Supervisors shall initiate removal of the voter's name from the checklist according to New Hampshire law. *Id.*

### v.     SB 3 Deems Additional Acts Voter Fraud

57.     SB 3 amends New Hampshire law to make three additional acts "voter fraud." Now, a person commits voter fraud if they: (1) present falsified proof of "domicile, or verifiable action of domicile"; (2) "purposely and knowingly provide[] false information" in a Landlord Affidavit; or (3) register to vote on Election Day[8] by choosing the Document Production Option and "purposely and[9] knowingly fail[] to provide a copy of the document by mail or present the document in person to the town or city clerk by the deadline." Ch. 205:13.

58.     The first two of these new crimes involve the presentation of falsified proof of domicile (presumably by registrants who are not in fact domiciled in New Hampshire as they

---

[8] This provision unnecessarily penalizes and suppresses the vote of those who utilize same day registration. It is also inconsistent with other provisions in SB 3. *See* Ch. 205:5, I(c)(2)(A) (establishing penalty for any applicant "[r]egistering within 30 days before an election or on election day").

[9] This provision requires a purposeful "and" knowing failure, which is inconsistent with other provisions in SB 3 that specify penalties for a purposeful "or" knowing failure. *See* Ch. 205:5, I(c)(2)(A).

claim), but the third clearly reaches and penalizes the simple failure to comply with SB 3's confusing documentation requirements by an arbitrary deadline, and does so with respect to people who are lawfully domiciled and have a constitutional right to vote in New Hampshire.

59.    All of these acts are subject to a class A misdemeanor penalty of imprisonment in the house of corrections for up to one year and a fine up to $2,000 as well as a civil penalty up to $5,000. *See id.*; RSA 659:34, I, II; RSA 651:2, II(c), IV(a).

### The 2016 General Election

60.    Historically, New Hampshire has had an evenly divided electorate, high voter turnout, and close elections; all trends that continued in the 2016 General Election.

61.    In 2016, Sununu (a Republican) won the gubernatorial race, and Democrats Hillary Clinton and Margaret Hassan narrowly won the presidential and U.S. Senate races.

62.    In 2016, New Hampshire also had the third highest voter turnout in the nation. More than 88,000 New Hampshire citizens registered to vote in the final month before the General Election, with 83,000 of those registrations occurring on Election Day alone. Voters who registered on Election Day made up 11 percent of the total votes cast.

63.    Upon information and belief, at the time the General Court enacted SB 3, it was aware that many of these same registrants are young, low-income, and racial minorities and that same day registration has a positive effect on the voter turnout of these groups. These groups are less likely to be familiar with the voting system, or to have the job flexibility, access to transportation, and resources that allow for earlier in-person registration at a clerk's office. They are also more likely to move often, necessitating frequent voter registration and re-registration.

64.    Upon information and belief, at the time the General Court enacted SB 3, it was also aware that young, low-income, and minority voters tend to vote Democratic and that long-

term national trends in party affiliation show that Democrats hold a substantial advantage among young voters in particular.

65.     In fact, in the 2016 General Election, the New Hampshire precincts with the highest number of same day registrations tended to be areas with the highest number of voters who were under the age of 25, non-white, renters, and living below the poverty level, and most of those precincts also voted overwhelmingly for Democratic candidates.

66.     For example, in Durham, home to the University of New Hampshire, more than 68 percent of the population is under the age of 25, and more than 32 percent of all ballots cast there came from same day registrants. Secretary Clinton won that precinct with 72.6 percent of the vote, and Senator Hassan won with 67.9 percent. Similarly, in Plymouth, home to Plymouth State University, where nearly 50 percent of the population is under the age of 25, more than 30 percent of all ballots cast there came from same day registrants, with 60 percent of the total vote going to Secretary Clinton and Senator Hassan. In Hanover, home to Dartmouth College, more than 43 percent of the population is under the age of 25, and more than 15 percent of all ballots cast came from same day registrants. Secretary Clinton won that precinct by over 87 percent, and Senator Hassan won with 78.4 percent. Likewise, in Keene, home to Keene State College, more than 27 percent of the population is under the age of 25, and more than 21 percent of all ballots cast there came from same day registrations. More than 65 percent of the ballots cast in all five wards went to Secretary Clinton, and more than 62 percent went to Senator Hassan.

67.     The eight cities and towns with the highest percentage of non-white citizens— Nashua, Hanover, Manchester, Lebanon, Somersworth, Portsmouth, Plymouth, and Durham— also had higher percentages of same day registrations than the rest of the state. The cities and towns of Manchester, Durham, Somersworth, and Plymouth are much more non-white than the

state average of 10 percent. Secretary Clinton and Senator Hassan won all eight towns.

68.    Also, the five municipalities with the highest percentage of same day registration—Durham, Plymouth, Keene, Manchester, and Somersworth—are all well below the state average in terms of owner-occupied housing. These include college towns and transient cities. Secretary Clinton and Senator Hassan won all of these cities and towns.

69.    Of the ten municipalities with the highest percentage of same day registrations, nine are above the state average for rate of poverty. They include Durham, Hanover, Plymouth, and Keene, all college towns with high numbers of adults with little to no income, but the working class cities of Franklin and Rochester also had higher percentages of same day registrations than the rest of the state. Both Secretary Clinton and Senator Hassan won most of these cities and towns.

70.    Additionally, and not surprisingly, many same day registrants are those who move during the year preceding an election (within the same county, across counties, or into New Hampshire from outside the State). Indeed, during the 2016 General Election, the greater the extent to which a New Hampshire town contained such mobile citizens, the greater the percentage of same day registrations in the town.

71.    Since its adoption, Republican groups have scrutinized same day registration and the voters who most often avail themselves of it, and have engaged in rhetoric meant to cast a suspicious eye on the validity of the votes of those who are new, young, and of lesser means. They have done so without any credible evidence that these voters are in fact anything other than genuine New Hampshire citizens, who are qualified—indeed, have a fundamental right—to participate in elections under New Hampshire law. And time and again, when they have controlled the General Court, Republicans have attempted to use the domicile requirement as a

means to limit access to the polls by these voters, despite all suspicions being wholly unfounded.

72.    During the 2016 General Election, over 76,000 same day registrants were either first-time voters or voters who re-registered after moving to a new town or ward. Rhetoric about voter fraud to the contrary, there is no basis to distrust the eligibility or validity of these voters.

73.    In fact, there has never been any plausible evidence that same day registration facilitates or is more susceptible to voter fraud. And as in years past, there is no credible evidence supporting any accusations that voter fraud—by same day registrants or any other group of voters—occurred in the 2016 General Election at anything other than a negligible rate.

74.    Nevertheless, in November 2016, then President-elect Trump falsely claimed on Twitter that "serious voter fraud" in New Hampshire was to blame for his and Senator Ayotte's losses here. He renewed this false claim during a private meeting with senators in February 2017, when he alleged—without a shred of evidence—that, but for the "thousands" of voters bused in from Massachusetts, both he and Senator Ayotte would have won in New Hampshire. Trump's senior adviser, Stephen Miller, repeated the false claims in a television interview.

75.    President Trump's false claims were widely rebutted, including by several prominent New Hampshire Republicans, who took the unusual step of publicly contradicting a President-elect of their own party, in response to his unsupportable claims.

76.    Steve Duprey, a Republican National Committee member and former chair of the New Hampshire Republican Party, posted on Twitter, "Repeating: there is no voter fraud in N.H. None. Zip. Nada. Hundreds of lawyers, poll workers, watchers, press -- no buses rolled in."

77.    Republican strategist Tom Rath, who served as New Hampshire's attorney general in the late 1970s and early 1980s, tweeted, "allegations of voter fraud in NH are baseless, without any merit -- it's shameful to spread these fantasies."

78.     Prominent New Hampshire Republican, Fergus Cullen, former chair of the New Hampshire GOP, went so far as to offer a $1,000 reward to anyone who could provide evidence of a single illegal vote cast by a Massachusetts resident who was bused in to New Hampshire for the 2016 election. Cullen has said that no one came forward to offer any evidence of voter fraud.

79.     Even President Trump's own former aide, Corey Lewandowski, who "live[s] on the border" of New Hampshire, publicly stated that he "didn't see buses coming across the line to say that, hey, we've moved up from Massachusetts." To put this in perspective, Mr. Lewandowski recently defended President Trump when discussing Trump's tweets about MSNBC host Mika Brzezinski, calling Trump "the Ernest Hemingway of Twitter."

80.     Defendant MacDonald also responded to the allegations, saying, "We have seen no evidence of large-scale voter fraud whatsoever, and none has been brought to our attention." And Defendant Gardner reported that his office received no complaints of voter fraud.

81.     As of the date of this filing, no one has come forth with any evidence to support President Trump's false claims about voter fraud in New Hampshire.

82.     Nevertheless, after Governor Sununu won in 2016 and became the first Republican to hold the Governor's office in 14 years—resulting in Republican control of the Governor's mansion and both chambers of the New Hampshire General Court for the first time since 2004—the General Court quickly got to work targeting voting laws in the name of nonexistent voter fraud. These efforts were backed by Governor Sununu, who voiced his support of restrictive voting legislation, saying he would even support a bill to end same day registration.

83.     Republican legislators were also encouraged by national conservative groups to "fix" provisions that ensured full and fair access to the franchise in New Hampshire. For instance, the Lawyers Democracy Fund sent a memorandum to members of the House Election

Law Committee in February 2016, lobbying to add a 30-day requirement for establishing domicile in New Hampshire. The memorandum also called the domicile requirement, student voters, and the use of affidavits "problems," yet it, too, failed to identify evidence of widespread voter fraud in New Hampshire.

### The Passing of SB 3 During the 2017 Legislative Session

84.    Heeding the call, Republican Senator Regina Birdsell introduced SB 3 in the New Hampshire Senate on January 19, 2017. Senator Birdsell—together with other supporters of the bill—justified the measure as a necessary response to the perception (no matter how unsubstantiated) that New Hampshire's elections have been adversely impacted by voter fraud.

85.    At no point has Senator Birdsell or any other high profile supporter of the bill asserted that any concerns about voter fraud are based in fact.

86.    In fact, Republican Representative Dan Itse admitted that "[w]e don't have rampant voter fraud," and Ray Chadwick, Chairman of the Granite State Taxpayers, agreed, "it's not proven that there is widespread voter fraud."

87.    Defendant Gardner also admitted that President Trump's claim of voter fraud "has not been proven," yet nevertheless testified that he supports the bill because "people believe that there's voter fraud," while at the same time boasting that New Hampshire has historically had very high voter turnout.

88.    And despite the torrent of public statements by some of New Hampshire's most prominent Republicans responding to and rejecting President Trump's claims of voter fraud shortly after the 2016 election, Republican legislative support for SB 3 was nearly universal, even in the face of vocal and vehement opposition and criticism by not only Democratic legislators but large numbers of concerned citizens, election officials, town officials, college

students, and organizations (including LWVNH, Open Democracy, the American Civil Liberties Union ("ACLU"), and the New Hampshire Municipal Association ("NHMA")).

89.    SB 3 was first heard at the Senate Election Law and Internal Affairs Committee hearing on March 7, 2017. The public testimony lasted for more than three hours.

90.    Just four individuals testified in support of the bill: Defendant Gardner, Representative Itse, Mr. Chadwick, and one citizen who testified that he "would like the Committee to worry less about voter fraud and more about students from New York and Massachusetts influencing our state elections."

91.    In contrast, more than 200 people signed in opposed to the bill, with 27 testifying in opposition. So many people showed up to the hearing—the vast majority in opposition—that it was moved to Representatives Hall to accommodate the unusually high public input.

92.    The scarcity of any evidence of voter fraud in New Hampshire was highlighted by many who testified, including Former Democratic Representative Jim Verschueren who said, "This bill is trying to address a problem that doesn't exist."

93.    Much of the testimony focused on the problems that the bill would *create*, rather than solve. The ACLU testified that the bill, among other things, adds a verifiable act criterion that is not a requirement under the New Hampshire Constitution, requires acts that impermissibly require money being paid to the government, effectively criminalizes voters who are unable or fail to submit documentation, and involves a lengthy and overly confusing process that "would needlessly hinder the voting rights of constitutionally-eligible voters in New Hampshire."

94.    Many also testified to the negative impact the bill would have on particular populations, such as students, the homeless, the impoverished, migratory workers, those who move shortly before Election Day, and people with physical, mental, and cognitive disabilities.

95.     Elena Ryan, a student at the University of New Hampshire, testified that "[f]or students like myself who do not live in university housing, this is disenfranchising." When asked if she could vote with a student ID and "a slip from whomever you're living with," she said, "With the language of intimidation, I would question if I would be able to register properly and wouldn't understand the steps to take. The populations that will be hit hardest by these extra provisions are out-of-state students." Ryan testified she does not have a driver's license.

96.     The Newbury Town Moderator, Nancy Marashio, objected to the bill based on the needless additional paperwork it created for the Supervisors and testified that "[n]o Newbury election official contacted about how they view SB 3 supports it." She further emphasized that voters who register on Election Day "have done nothing wrong," yet the bill "targets voters who change residence or choose to legally register on Election Day." She asserted that "[t]hose voters deserve to be treated equally to every other voter."

97.     Leslie Enroth, a former Selectwoman in Sutton, testified that "[t]he changes to the voter registration form are so long and complicated that it becomes a literacy test." She asked, where "[p]eople have died for the right to vote, why are we making it harder?"

98.     That the threat of home visits and criminalization will "subject voters to fear and intimidation" were also frequently mentioned. Overall, the sentiment of the people of New Hampshire was that SB 3 would "steer people away" and make it harder for them to exercise their most precious right.

99.     Michelle Sanborn, of the New Hampshire Community Rights Network, testified that "[t]he bill does not protect or expand voting rights. It brings us back to a time when the right to vote was reserved for the privileged. . . . It is clear today that the public does not consider this bill to be for the public good."

100.    The testimony also highlighted unworkable aspects of the bill. Cordell Johnston, of the NHMA, testified that "[t]he length and complexity of the same day voter registration form is a concern for both the voter and local officials, who must determine whether someone satisfies the criteria. It seems likely to result in longer lines at the polls." The NHMA also submitted lengthy written testimony outlining the many internal inconsistencies in the law.

101.    Liz Tentarelli, President of LWVNH, testified that "[t]he League regards the right to vote as the most important right we have, because by voting we have a voice in all the other actions of government that affect us. Any attempt to deny that right, just because a person does not have the same kind of permanent home nor typical photo ID that you and I likely have, is an attempt to pass judgment on the very people who may need a voice the most." She pointed out the many impractical aspects of the law when considered in light of many real-life situations, such as when one lives with a friend, has a disorganized filing system, uses a post office box, or moves after an election but before an investigative visit from election officials.

102.    Louise Spencer, of the Kent Street Coalition, testified, "What disenfranchises people is when they aren't able to cast their vote, which happens when obstacles are put in their way. People who haven't voted before find it an extremely intimidating process. They have the sense that they are somehow not welcome at the polls. If they have to sign an affidavit that says police may come to your door or that you'll get a $5,000 fine, they won't even try to get involved."

103.    Despite the public outcry against the bill, the Senate passed SB 3 on March 30, 2017, along strict party lines.

104.    SB 3 was introduced in the House on March 23, and on April 18, the bill was heard by the Election Law Committee. The hearing again drew so many people it had to be

moved to Representatives Hall, and the public testimony lasted more than six hours. Nearly 175 individuals signed in opposed to the bill, while only 44 did so in support. Nearly 40 testified in opposition, which was more than double those who testified in support.

105.    None of the testimony of the supporters included any plausible evidence of voter fraud, and while Republican Representatives Doug Thomas and Al Baldasaro claimed, without any evidence, that there were cars full of out-of-state residents who voted in the 2016 election, Defendant Gardner reconfirmed that his office has "never been provided proof" of such stories.

106.    Other testimony in support exposed a general sentiment among the bill's supporters that college students are not welcome to and should not participate in New Hampshire's elections. One citizen said, "If students want to vote, they should go to their hometown and vote since they are still under the roof of their parents." Similarly, Republican Representative Tim Twombly testified that those who are from out of state should be made to vote absentee in the states they came from, and not in New Hampshire—despite the fact that, under U.S. Supreme Court precedent, doing as the Representative suggested and excluding perceived "outsiders" who live New Hampshire from voting here is plainly unconstitutional.

107.    Similarly, former Republican Senate Majority Leader Robert Clegg said that he does not want students voting in his town—whether they come from elsewhere in New Hampshire or out of state—because "none … actually pay the bills in the communities they're voting in," and he implored them to "please don't vote in my community." He added, "voting's not for anyone who wants to participate, it's for those who want to participate in their communities"—a view that he may be entitled to have, but which is not a constitutional basis for enacting restrictive voting laws.

108.    And, ignoring that many such students do not drive or own a vehicle and that the

New Hampshire Supreme Court previously held such a requirement impermissible under the State Constitution, Republican Representative Dennis Green testified that prospective voters should be made to establish residency by getting a driver's license and registering a vehicle before they can vote in New Hampshire.

109.    This testimony was directly contrary to established law, which explicitly permits students to lawfully claim domicile for voting in the town or city in which they live while attending college, RSA 654:1, and deems unconstitutional laws restricting students' access to the franchise, *see Guare v. New Hampshire*, 167 N.H. 658, 669 (2015); *Newburger v. Peterson*, 344 F. Supp. 559, 563 (D.N.H. 1972); *see also Carrington v. Rash*, 380 U.S. 89, 94 (1965).

110.    In contrast, testimony in opposition to the bill overwhelmingly emphasized the many reasons that SB 3 is unconstitutional and will disenfranchise eligible voters. Several spoke about how there is no data backing up the rumors of voter fraud. Others expressed concern that the bill will improperly subject lawful voters to investigation and civil and criminal penalties due to voters misunderstanding the rules and the "literacy test" to which the bill amounts.

111.    Many testified about the myriad ways the bill would harm voters. Pat Wallace spoke about her concern for those individuals who cannot read. She also spoke about the impact the bill will have on the homeless population who do not have addresses.

112.    Ana Ford submitted testimony regarding her concerns about how the bill will affect men and women in uniform, noting that because they are transferred frequently, they will be denied their right to vote under SB 3. She cautioned, "when you cast a wide net, you catch some things you didn't intend to. And when you're on a fishing expedition for something that doesn't exist, a lot of people will be caught in the net . . . undeservedly so."

113.    Darryl Perry spoke about situations that would prevent voters' ability to present

required documentation, noting that the bill could disenfranchise people living in a town without public schools or who enroll their children in private school, people who use a post office box, people who do not themselves own the vehicle they drive, and people with a verbal lease.

114.    Gwen Friend testified, "The bill would negatively affect the right to vote for indigent people, who often move to find better or cheaper housing; members of the military temporarily assigned to New Hampshire but planning to return to another state upon discharge; the homeless; students who are here but do not intend to make New Hampshire their home (or just do not know yet where they will live after college); and those new to the state or those moving to another town within New Hampshire."

115.    A number of first-time voters and college students testified, including 20-year-old student Charlotte Blatt. She said that SB 3 "makes voting unnecessarily difficult and confusing for some voters, particularly young voters like myself who see this legislation as an indication that they are unwelcome and not allowed to vote in New Hampshire."

116.    Sydney Little testified that she was able to vote for the first time in Keene where she was in college by signing an affidavit, but had SB 3 been the law, she may not have been able to prove domicile as now required. When asked if she had access to an absentee ballot from the place where she grew up, she said, "I didn't want one because I consider Keene my home." In fact, a fair amount of testimony in support of SB 3 focused on college students' ability to get an absentee ballot from the state where their parents live. Yet, as a number of students testified, they are legally entitled to vote in New Hampshire, and often cannot get an absentee ballot in the state from which they moved to New Hampshire because they no longer reside there.

117.    Connie Lane testified that, based on her 15 years of observing the polls across the state, she is confident "[w]e have a solid system that has worked well over the years" and that

"the changes in SB 3 are clearly targeted at suppressing votes, not preventing fraud." She said, "It is telling that the calls for reform of our voting process have not been requested by the moderators or supervisors of elections, the city clerks, or the Attorney General. If there was rampant fraud or extreme difficulties enacting our voting laws, these groups would be proposing legislation. But they are not. In fact, the moderators and supervisors oppose the legislation due to the additional work and expense that it will require."

118.    Ms. Lane continued: "Many students and low-income voters do not have leases, may not know the legal name of their landlord, or may not even be on the lease. . . . Many . . . do not have cars and/or work several jobs . . . . [and] returning to the town/city clerk's office with the correct documentation is more than an 'inconvenience' for these individuals. They must use public transportation or rely on other people for transportation, as well as juggle multiple work schedules. Finally, low-income people often do not have the money to register their vehicles—they have little left over after providing food, health and shelter to their families."

119.    The testimony of election officials was also extensive and overwhelmingly against SB 3. Patricia Little, Keene City Clerk for 36 years, submitted testimony about the "unreasonable burden being placed on local officials to verify domicile after an election." She noted that "[c]ongestion in lines because people are not moving through the process quickly, causes confusion and frustration [that] can lead to a less than ideal environment for an accurate election." As a result, "the passage of SB 3 is going to disenfranchise not only the voters who are attempting to register to vote, but also those . . . arriving at the polling location [to vote]."

120.    Suzanne Russell, Newbury Supervisor, testified it is inappropriate to request documents from voters that contain private information, such as school registration forms and tax returns, both listed in SB 3 as acceptable proof of a verifiable act of domicile. She also said that

the registration forms are cumbersome and could potentially create big errors.

121.    Jean Lightfoot, Hopkinton Supervisor, spoke against the provision calling for election officials to make home visits, saying, "I would resign before I did this dangerous task. We are record-keepers."

122.    Fran Taylor, who was the Holderness Supervisor for 15 years, testified that many of the same day registrants she assisted were young people voting for the first time and that watching these young people go through all of the steps necessary to vote "is not the behavior of someone trying to fake their identity, it's an indication that they want to exercise their constitutional right to vote." She also testified that having election officials make "bed checks" of registrants is "unreasonable, unnecessary, and intimidating," adding that "new voters don't need to be harassed, they should be encouraged and welcomed when they come to vote."

123.    Representative Wayne Burton of Durham testified that "the impact on Durham specifically would be significant," noting that the law will unfairly burden students and create long lines that will discourage voters. Durham Town Moderator Chris Regan spoke about the severe administrative burdens the law would impose on local election officials, and Durham Town Councilman Kenneth Rotner testified that the Town of Durham does not support the bill and spoke to how the bill is unworkable.

124.    Finally, Richard Aldrich of the Chesterfield Planning Board testified that generations of veterans in his family did not fight with the mindset "that we were protecting the right to restrict and burden the right to vote." He said, "this bill smacks of Jim Crowe cronyism," as it requires voters to "fill out this form that takes 30 minutes to read" and extraordinary levels of educational achievement to understand. He said, "This is nothing more than a thinly veiled attempt by a very partisan group to restrict and intimidate those who they do not want to vote.

There's just no question in my mind that that's what's going on."

125.    In spite of the extensive and powerful testimony against SB 3, evidencing how it would disenfranchise legal voters, the bill was amended and passed out of Committee on May 25, 2017, and the House passed SB 3 on June 1, largely along party lines.

126.    In volume 39, number 26 of the House Record, the majority justified the bill by as much as admitting that "serious voter fraud" is not a problem in New Hampshire and instead claiming that the "domicile loophole" created "*opportunities* for voter fraud."

127.    On June 8, 2017, the Senate concurred in the amendments the House made to the bill. SB 3 was enrolled by the Committee on Enrolled Bills on June 22, and signed by Governor Sununu on July 10. SB 3 takes effect September 8, 2017.

128.    The new voter registration process prescribed by SB 3 will affect same day registration for a special election scheduled for September 12 in Belknap County. SB 3 will affect same day registration for a special election in Hillsborough County, a special election in Sullivan County, and a primary election in Manchester scheduled for September 19. SB 3 will affect same day registration and approximately one week of in-person registration at the local clerk's office for a special election scheduled for September 26 in Rockingham County. SB 3 will affect all aspects of voter registration for municipal elections scheduled for October 3 in Franklin and Keene; municipal general elections scheduled for November 7 in Claremont, Manchester, Keene, Nashua, Portsmouth, Rochester, and Concord; and all other future elections.

**SB 3 Imposes Undue Burdens on New Hampshire Voters**

129.    The procedural requirements, associated penalties, and incomprehensibility of SB 3 will unduly burden and disenfranchise potential voters, cause many otherwise qualified citizens not to register to vote, and contribute to already long polling places lines.

i.    **The Procedural Requirements of SB 3 Will Burden and Disenfranchise Voters**

130.    If SB 3 is not enjoined, citizens who are lawfully qualified to vote under the New Hampshire Constitution will have that right severely burdened or, in some cases, entirely denied, because (a) they have not committed a "verifiable" act of domicile, as defined by the General Court; (b) they do not possess, or fail to produce, paperwork that local election officials deem adequate to evidence such an act; or (c) they do not register at all because the new law causes them to be confused, mistaken about eligibility, or too intimidated to try.

131.    The requirements of SB 3 may be easy for some to comply with, but not for many others because compliance is dependent on stable housing, property ownership, vehicle ownership, having a child enrolled in public school, income, obtaining utility services or arranging for mail delivery at a particular street address. Thousands of people in New Hampshire who are otherwise qualified to vote either do not have these legislatively mandated indicia of intent to be domiciled or lack the means to provide proof of them. Indeed, providing proof is also contingent on one's ability to successfully complete complicated transactions, make complex arrangements, pay licensing fees, keep easily accessible and orderly personal records, make multiple trips to governmental offices, or coordinate with and depend on the cooperation of third parties in time for Election Day.

132.    Some of the documents listed by SB 3—such as driver's licenses, identification cards, vehicle registration forms, tax forms, and other government-issued forms—will be insufficient if they do not contain a registrant's current address. *See* Ch. 205:1, II(d). But many of these documents are not required to be updated. For example, New Hampshire law does not require that individuals who update their address with the Division of Motor Vehicles (DMV) also obtain a replacement license (which requires an in-person visit to the DMV and payment of

a fee of $3.00). Thus, many eligible registrants will have engaged in a verifiable act of intent to be domiciled in their community, yet will not satisfy the requirements of SB 3 unless they pay a fee to the government, which the law does not require to maintain their legal driving status.

133.    Some of the documents listed by SB 3—leases, deeds, and utility bills—only satisfy the law's requirements if they contain the registrant's name, *see id.*, a requirement that qualified registrants who have the requisite domiciliary intent but live with roommates, friends or family, will often have difficulty meeting. And the Landlord Affidavit is an unduly burdensome and unworkable alternative. First, the Verifiable Action of Domicile Form states that those who are renters who do not have other proof of domicile "are *required*" to obtain a Landlord Affidavit. *See id.* (emphasis added).[10] Second, these registrants must determine who is listed on the lease or deed or is authorized to sign the Landlord Affidavit as an "agent who manages the property." *Id.* Third, they must then contact that person and convince them to cooperate. Finally, they must draft "a written statement, signed under penalty of voting fraud," that satisfies the legal requirements of SB 3 and obtain a signature in time for Election Day. *Id.*

134.    For some of the acts listed by SB 3, it is unclear precisely what paperwork is sufficient, making it difficult for registrants to arrive with the correct paperwork and putting individual election officials in the position of subjectively deciding what is adequate. For example, the option of providing evidence of "residency, as set forth in RSA 654:1, I-a [the domicile provision for college students], at an institution of learning at the address on the voter registration form" is both burdensome and vague. *See id.* SB 3 conflates residency with domicile and does not specify what documents constitute such evidence. SB 3 does not state whether a

---

[10] Elsewhere, SB 3 states that registrants "may" obtain a Landlord Affidavit. *See* Ch. 205:1, II(e) and 205:5, I(c)(1)(B). Even if it is not the intent of SB 3 to *require* registrants to obtain a Landlord Affidavit (such that they are ineligible to opt to use the Investigation Option), it is conceivable that many will read the Verifiable Action of Domicile Form—which registrants are given a copy of and serves as a guide to what they are required to do—and believe that obtaining a Landlord Affidavit is their only option to vote and avoid penalties.

student ID card—which lacks the student's address—will suffice, or if students must also obtain a document bearing their address from some unknown office at their college or university. This requirement will be particularly burdensome for the many students who do not live on campus.

135.    Similarly, the option for those who are homeless to provide evidence of "arranging for a homeless shelter or similar service provider located in the town or ward to receive United States mail," *see id.*, is burdensome and vague where this vulnerable population may find it too difficult, risky, or unnecessary to arrange for mail delivery, and it is unclear what type of documentation they must obtain to prove they did so. SB 3 does not explain whether a copy of a sign-up sheet, for example, is sufficient or whether registrants must obtain a written statement similar to the Landlord Affidavit. Also, the shelter must be located in the town or ward where the registrant seeks to register, which makes obtaining documentation all the more difficult, as many towns and wards do not have shelters and not all provide mail services.

136.    Some of the paperwork requirements will not in fact show where a registrant is truly domiciled. For example, those with summer homes in New Hampshire could easily register in a town or ward where they are not lawfully domiciled using any documentation that bears the address of their second property. And those who enroll their children in a school district that— for one reason or another—allows enrollment from outside the town or ward could register to vote where their children go to school rather than where they are domiciled.

137.    In sum, SB 3 will leave many potential voters confused about what paperwork they need to bring with them to the local clerk's office or the polling place. They may not know or understand what "reasonable documentation" is, think that some paperwork is adequate when it is not, or, worse, not even attempt to register because they are unable to locate paperwork, believe they cannot register, or are too afraid to try.

138.    SB 3 unjustifiably eliminates the option for registrants to prove their domicile by completing a Domicile Affidavit or sworn statement. Ch. 205:2, IV(c) and 205:5, I(c). These options have been an acceptable option for proving domicile in New Hampshire since 1979, requiring registrants to swear under penalties of perjury and voter fraud and subjecting them to penalties if they were untruthful. In doing so, SB 3 deems the sworn word of registrants unreliable in inconsistent ways, as all registrants may still execute Qualified Voter Affidavits and sworn statements as to their identity, citizenship, and age. Ch. 205:2, IV(c) and 205:5, I(a).

139.    Moreover, in the case of the Landlord Affidavit and perhaps the homeless shelter documentation, SB 3 nonsensically accepts the sworn word of a third party as proof of a registrant's domicile, but not the registrant's own sworn statement. (That is the case even though the Landlord Affidavit will be executed outside the view of an election official.) The inexplicable and burdensome result is that the fundamental right to vote of these individuals (who, as reflected by the circumstances of their living arrangements, are much more likely to have less financial means than those who, for example, own their home) may now be contingent upon their obtaining the timely compliance of third parties who are, more often than not, ordinary citizens who are in no way required or incentivized to provide the assistance required.

140.    Also, SB 3 contains numerous other measures that in practice treat similarly situated citizens differently for arbitrary reasons. For instance, a registrant who attempts to register 31 days before Election Day and does not have the requisite paperwork will be turned away, but a registrant who attempts to register the following day, 30 days before Election Day, will be permitted to register even without the requisite paperwork. Likewise, registrants who live in some towns will be given 30 days to submit paperwork after Election Day, while registrants who live in other towns will only be given 10 days.

141.    By way of further example, a registrant who is a long-time domiciliary of New Hampshire who registers to vote for the first time is presumed to be qualified to do so, while a registrant with the requisite domiciliary intent who happened to move to New Hampshire less than 30 days ago is presumed to be unqualified to vote.

142.    Similarly, a qualified registrant who is domiciled in New Hampshire who brings, for instance, his tax forms to register will be permitted to vote, while a qualified registrant who is domiciled in New Hampshire who also has tax forms but forgets to bring them to register will be denied registration or subjected to additional verification procedures, invasive investigations, and potentially criminal and civil penalties.

143.    Given the lack of clear guidance in the law as to what constitutes reasonable documentation, qualified registrants will also be treated differently depending simply on who happens to review their form and documentation. Thus, a clerk in Durham might allow a college student to register with a driver's license with an address other than the one listed on the registration form and a student ID, while a clerk in Keene might deny registration to a college student who brings the same documentation. Similarly, a poll worker at a polling place in Nashua might allow qualified registrants to register with bank statements or pieces of mail—which are not explicitly listed in SB 3—while a poll worker at a different polling place in Nashua might refuse to accept such paperwork from other qualified registrants.

144.    SB 3 unreasonably denies voter registration entirely to "more than 30 days" registrants who go in person to their town or city clerk's office during business hours to register to vote but who may not be informed they need to bring with them, have forgotten, or could not locate acceptable documentary evidence of a verifiable act. Ch. 205:5, I(c)(1)(A). These individuals, who are already undertaking significant burdens to abide by New Hampshire's

unique in-person registration requirement, will be turned away and told to return multiple times until they can present satisfactory paperwork. They may have had to pay for child care, make arrangements with their employers or take leave from their jobs, or locate and pay for reliable transportation to arrive at the clerk's office. Yet they will be denied registration even though they are legally domiciled in New Hampshire and, if given the option, would be willing to swear under penalties for voter fraud to that fact. Many who are denied will not make a second trip, either to register or vote. Moreover, every individual who is denied early registration could wind up having to register on Election Day, subjecting them to the additional burdens that same day registrants now face under SB 3, and lengthening already long polling place lines.

145.    SB 3 subjects "within 30 days" registrants who do not have the requisite documentary evidence when registering to a long and confusing Voter Registration Form and Verifiable Action of Domicile Form, the completion of which is likely to contribute to already long polling place lines. They must also agree to either the Document Production Option or the Investigation Option, after supposedly understanding the complicated procedures outlined by SB 3 in its incomprehensible legal language. They must determine whether they have documentary evidence sufficient to prove domicile (a difficult determination to make while standing in line to vote) and are thus obligated to produce those documents under the Document Production Option, or whether they do not have any documentary evidence and may choose the Investigation Option. In making their decision, registrants must also acknowledge their domicile will be further verified by election officials. Having to quickly read, understand, and sign a sworn statement is an intimidating process. Those registrants who are unable to choose and complete the form will not be permitted to cast a ballot, even though they are legally domiciled and, if given the option, would be willing to swear under penalties for voter fraud to that fact.

146.    SB 3 will also burden the ability of those who have recently moved to register to vote, as they now must prove they are not present for "temporary purposes" and that they do not fall within one of the non-exhaustive and ill-defined "temporary" situations listed in the law. The law will discourage those who have non-permanent job assignments but are otherwise domiciled from attempting to register and threatens the free speech and association rights of those who come to New Hampshire to work on political campaigns.

147.    Although SB 3 requires all New Hampshire citizens to prove they are domiciled, the new presumption that those who recently moved and are new to New Hampshire or new to a town or ward are not qualified to vote contradicts a long-standing presumption under New Hampshire law that any citizen seeking to register to vote is qualified to do so. *See* RSA 654:11. This presumption also violates the doctrine that presumptions of law may be created by statute only if there is a rational connection between the fact proved and the fact presumed. *See McIntire v. Borofsky*, 95 N.H. 174, 177 (1948).

### ii.    The Penalties Imposed by SB 3 Will Burden and Disenfranchise Voters

148.    SB 3 imposes unduly harsh penalties on those who lack or fail to provide documentary evidence to prove domicile. "Within 30 days" registrants who do not present evidence of a verifiable act must choose between two highly confusing post-election verification options that make them vulnerable to fines, imprisonment, and invasive investigations—all stemming from nonsensical, unnecessary, and burdensome paperwork requirements.

149.    If registrants choose the Document Production Option, they are agreeing to locate and mail or submit in person documentation that they believe satisfies SB 3's confusing new documentation requirements, within 10 days after Election Day or 30 days where the town

clerk's office is open 20 hours per week or less. Ch. 205:5, I(c)(2)(A).[11] This requires registrants to know the hours of operation of their clerk's office and establishes two arbitrary deadlines instead of granting all registrants 30 days to submit paperwork. If they fail to meet the deadline—for any reason—they are subject to further investigation by the Supervisors. Ch. 205:1, V. They are also susceptible to serious criminal and civil penalties, as any knowing or purposeful failure to present paperwork by the deadline is subject to a $5,000 civil penalty and a class A misdemeanor fine up to $2,000 and imprisonment up to one year. Ch. 205:13, I(h).

150.    The "knowing or purposeful" failure is not itself linked to any fraudulent act—thus, the Document Production Option effectively criminalizes and imposes steep fines on otherwise qualified and domiciled registrants if they find it harder than expected to obtain the documentation the law now requires, or simply decide, given their individual circumstances, that they cannot afford the time or cost of submitting documentation in the arbitrary time frame established by the law. In other words, the law does not penalize fraudulent voting by individuals not eligible to cast a ballot. Rather, it penalizes failure to comply with an unnecessary and burdensome paperwork requirement that is infinitely easier for certain registrants to meet than others, based purely on their personal circumstances, including wealth, privilege, and age.

151.    Moreover, a "knowing" failure to submit documentation could include many otherwise benign acts, where a person acts "knowingly" when he "is aware that his conduct is of such nature or that such circumstances exist." RSA 626:2, II(b). For example, a lawfully qualified registrant who is injured after an election and physically unable to submit documentation by the deadline would certainly be "aware" of the missed deadline.

152.    Registrants may choose the Investigation Option instead, which requires they acknowledge that they are unaware of any documentary evidence of actions carrying out their

---

[11] It is unclear what, if anything, will happen if a voter submits documentation that is then deemed insufficient.

intent to be domiciled[12] and that they will not be submitting any paperwork after Election Day, and acknowledge that their domicile will be subject to investigation. Ch. 205:5, I(c)(2)(B). The investigations could include invasive home visits by two or more officers. As many opponents of the bill pointed out in the public hearings, this in and of itself is likely to intimidate and discourage lawfully qualified citizens from exercising their most fundamental right.

153.    The Voter Registration Form and the Verifiable Action of Domicile Form do not explain the penalties and consequences that arise under the two post-election verification options. As a result, many who register likely will not understand that if they commit to submitting paperwork after Election Day but fail to do so by the deadline—even if the failure has nothing to do with their actual eligibility to vote—they may be subject to criminal and civil penalties. Likewise, many are likely to not understand that, no matter which option they choose, they are giving explicit permission for elections officials to engage in invasive home visits.

154.    SB 3 exposes registrants to other potential criminal and civil penalties. "Knowingly or purposely" providing false information when registering to vote is voter fraud, so registrants who actually have documentation but choose the Investigation Option because they do not want to submit paperwork after Election Day could be exposed to a $5,000 civil penalty and a class A misdemeanor fine up to $2,000 and imprisonment up to one year. Ch. 205:2, IV(c). Likewise, a registrant who provides on the Voter Registration Form the wrong date that they moved to the address provided on the form may be subject to criminal and civil penalties for "knowingly or purposely" providing false information when registering to vote. *Id.* Finally, voting when not qualified to do so is voter fraud. Where SB 3 provides that a registrant who chooses the Investigation Option "does not possess reasonable documentation of establishing

---

[12] Adding to the confusing nature of the new requirements, the form is written in such a way that it would appear as if the voter must swear they are unaware of any such documentation in existence anywhere; it is not limited to documentation in their possession.

44

domicile *and has taken no verifiable action to carry out his or her intent to establish domicile at the address claimed on the voter registration application*," Ch. 205:5, I(c)(2)(B) (emphasis added), it essentially deems such a registrant non-domiciled and thereby unqualified to vote.[13] If that is the case, they may be exposed to a $5,000 civil penalty and a class B felony fine up to $4,000 and imprisonment up to seven years. RSA 659:34, I, II and RSA 651:2, II(b), IV(a).

155.    SB 3 penalizes registrants in an arbitrary way based on which post-election domicile verification procedure they choose. Those who do not have documentation may choose the Investigation Option, while those who do have documentation must choose the Document Production Option, assume the obligation to submit paperwork after the election, and be subject not only to invasive investigation if they fail to submit documentation by the deadline, but also criminal and civil penalties if the failure is "knowing or purposeful."

156.    SB 3 is silent as to what will occur during post-election home visits and how the home visits will show officers that a registrant was domiciled at that address on an Election Day that has already passed—for example, how will officers gain access to private property; what specific information will they seek; what will they ask the registrant that they could not have asked on Election Day at the polling location; and what will happen if the registrant is not home or no longer lives there because they have since moved (which, under the law, would not on its own destroy their rightful claim to domicile on Election Day). Furthermore, SB 3 places even more subjective judgment in the hands of election officials who will not only be required to determine whether a registrant's paperwork is sufficient but also whether a voter's story "checks out" after Election Day. This makes it nearly impossible to administer the law consistently throughout the State, or even within a given ward.

---

[13] Even if this is not the intended result, this is the type of confusion wrought by the provisions of SB 3. Its use of "verifiable" as equivalent to "documentation" is a non sequitur because even if a registrant takes a verifiable act, it does not necessarily mean that he or she possesses documentation.

157.    Finally, when submitting paperwork to prove domicile, registrants must provide a copy that will be retained by the clerk and attached to their Voter Registration Form. Ch. 205:5, I(c)(2)(A). Accordingly, documents with sensitive information—such as social security numbers, names of spouses and minor children, birth dates, income, housing status, and medical information—will be retained on record in either the clerk's office or by the Supervisors.

### iii.    The Incomprehensibility of SB 3 Will Burden and Disenfranchise Voters

158.    SB 3 contains confusing, ambiguous, and internally inconsistent standards and procedures that will confuse even the most sophisticated registrants, make it difficult for election officials to implement, and contribute to already long lines at polling places.

159.    Indeed, SB 3 will be incomprehensible to a large percentage of the population, as it requires prospective voters to navigate complicated forms and processes as a prerequisite to exercise their fundamental right to vote.

160.    When the "within 30 days" Voter Registration Form is subjected to an analysis using standard readability tests, it is plain that the form is too difficult for the average citizen to easily understand, as it is written at a doctoral program reading level. Moreover, the form will be used on Election Day when registrants will be rushed to complete it at the polling place.

161.    The Verifiable Action of Domicile Form suffers from the same problem. This document is written at a reading level of a college graduate, plus one year of graduate school, yet it is meant to serve as a guide for registrants who must submit documentation after Election Day.

162.    The forms are also unnecessarily lengthy (which interferes with cognitive processing), use text with unfamiliar language, and fail to lay out instructions in a clear manner.

163.    Studies have shown that plain language and thoughtful presentation are critical for voter understanding, and SB 3 violates most of these best practices. Simply put, many registrants

will not understand these forms, which will decrease the likelihood that they will vote and increase the likelihood that they will mistakenly run afoul of SB 3's penalties.

164.    Further, the language that spells out the criminal and civil penalties and extent of the investigations that many registrants will be subjected to as a result of SB 3 is not located on the forms that they will actually receive while registering; instead, it will be buried in the statutory text of RSA 654:12. Thus, SB 3 fails to provide sufficient notice of its penalties.

165.    The confusing nature of registration under SB 3 will undoubtedly contribute to the already long polling place lines that have been growing in New Hampshire for the last decade as the General Court has continued to add unnecessary complexity to the process. Many registrants will arrive with insufficient paperwork, and it will take longer for every individual to read the forms, ask questions, register, and vote, causing the lines to move slowly and grow throughout the day. Many voters—those who seek to register the same day and those who are already registered—will be unable to stand in line for hours and will leave or not even try.

166.    The confusing procedural requirements under SB 3 will also prevent election officials from efficiently registering voters and maintaining the voter checklists. It is unclear how many of the provisions in the bill should be administered, and, moreover, the additional procedures will require more resources. Yet, the bill provides no additional funding for educating voters, training election officials and volunteers, compiling submitted domicile documentation after elections, performing investigations and home visits, or fixing errors that are sure to follow.

### SB 3 Imposes Disparate Burdens on Particular Groups of New Hampshire Voters and Targets Young Voters In Particular

167.    At its core, SB 3 imposes disparate burdens on those who seek to lawfully register close to or on Election Day, as those registrants will face incomprehensible forms, penalties, ongoing investigations, and unreasonably long polling place lines.

168.    The individuals who are most likely to register close to an election and use same day registration include young people, low-income people, minorities, and those who recently moved or move frequently, all of whom are likely to find SB 3's documentary requirements particularly difficult to meet. They also are less likely to have stable housing, access to reliable transportation, utilities in their name, or meet other conditions that constitute a verifiable act. They are less likely to have access to resources that make taking the time to comply with the new requirements of SB 3 possible. Many are also less informed about the voting process and likely to have less education, making compliance more difficult.

169.    Where more than 88,000 people in the 2016 General Election registered in the final month before and on Election Day, this is a sizable group that will be disproportionately detrimentally affected by SB 3.

170.    Among those groups, young people—who overwhelmingly vote Democratic—use same day registration the most. SB 3 will therefore burden these registrants more so than others, and, upon information and belief, SB 3 was passed with the specific purpose of suppressing the young vote for political gain and not in furtherance of any legitimate purpose.

171.    Indeed, SB 3 is the latest addition to New Hampshire's 20-year history in which Republicans have set out to enact legislation that limits access to the franchise by same day registration voters (and specifically young voters) by tinkering with the meaning of "domicile" and imposing burdensome documentation requirements. As with SB 3, these past actions have not been based on any actual incidents of voter fraud, but rather a desire to narrow the electorate in favor of the Republican base by making it harder for these constituencies to vote.

172.    Coming into the 1990s, New Hampshire had consistently been a Republican-controlled state, with a unified Republican government in both the General Court and the

Governor's office. But after the General Court enacted same day registration in 1994, voter participation in New Hampshire increased, and the political makeup of the state shifted such that Democrats took control of the Governor's office from 1996 to 2002.

173.    When the Republican Party reclaimed the Governor's office in 2002 and retained control of both chambers of the General Court, House Bill 627 (2003) ("HB 627") was enacted, which, for the first time since the election laws were codified in 1979, modified the definition of domicile, heightened the documentary and procedural requirements to prove domicile, and increased the penalties for voter fraud.

174.    Though supporters of HB 627 cited unfounded voter fraud to justify the bill, the legislative history shows that it was actually aimed at limiting access to the polls by young people and those citizens who were most likely to use same day registration.

175.    For instance, former Republican Representative Donald Stritch testified—without proof—that same day registration "increases probability of voter fraud." He submitted a letter discussing the "concerns of many citizens residing in a college town," written by a constituent who complained, "The current system makes it too easy to commit voter fraud and also means that a bunch of college students or others could, as a lark, go to the polls in a small town and nullify the wishes of the permanent residents with no worry on their part that they would suffer any ill effects."

176.    HB 627 was strongly opposed based, in particular, on concerns about the impact it would have on young voters. In an op-ed that was submitted to the Senate Internal Affairs Committee, a law professor wrote that "[t]here is simply no evidence that same day registration creates a serious problem of fraud in elections," and he believed that the real reason for the legislation was "[t]he fear that new voters will weaken the power of those in control." Legislators

in opposition dubbed the bill the "Voter Intimidation Act of 2003."

177.    Republicans held onto unified control for just two more years. In 2004, New Hampshire elected a Democratic Governor, and from 2006 to 2010, New Hampshire had a unified Democratic government. During this period, when diverse, young voters were impacting state and federal elections more than ever before, the General Court revisited the domicile issue with House Bill 614 (2009) ("HB 614), which added to the definition of "domicile" the explicit provision making it clear that: "A student of any institution of learning may lawfully claim domicile for voting purposes in the New Hampshire town or city in which he or she lives while attending such institution of learning if such student's claim of domicile otherwise meets the requirements of RSA 654:1(I)." RSA 654:1, I-a (2009). The sponsor of HB 614, then Representative David Pierce, explained that the bill "clarifies that students can claim domicile for voting purposes," and he referenced *Newburger v. Peterson*, 344 F. Supp. 559 (D.N.H. 1972), in which the U.S. District Court for the District of New Hampshire struck down as a violation of the U.S. Constitution a law that effectively disqualified from voting a Dartmouth College student who intended to return to his "home state" after graduation.

178.    Republicans strongly opposed HB 614 specifically because it protected the rights of students to vote. Testimony against the bill included complaints that "students are adversely affecting local elections," that candidates were losing local elections "because a bunch of college students voted a Democratic straight ticket," and wholly unsubstantiated claims that students and "out-of-state activists" were being bused in to vote. Overwhelmingly, the concerns were not that college students were not qualified under the New Hampshire Constitution to vote, but rather that the viewpoint of students did not mesh with the non-college residents of the communities in which the students lived and sought to participate in the franchise.

179.    For example, one woman asked, "Do we honestly believe that the majority of these students really care about who runs our government?" A legislator opposed similarly complained, "[t]he minority is concerned that we are heading down a path, with our registration process, that will lead to disaster for certain communities and possibly entire counties. . . . It is not a stretch of ones [sic] imagination to envision that in a college town students could take over the governments and budgets of those towns, if they were so motivated."

180.    Though Democrats would continue to hold the Governor's office for the next eleven years, Republicans took back control of the General Court in 2010, and they once again sought to limit the youth vote by passing Senate Bill 318 (2012) ("SB 318"), which, among other things, merged the concept of "domicile" with the concept of "resident" by requiring registrants to acknowledge on the voter registration form that they are bound by New Hampshire residency requirements to register a vehicle and apply for a New Hampshire driver's license. In support of the bill, the former House Speaker said he did not want college students voting because "[t]hey do what I did when I was a kid and vote for liberals."

181.    To pass SB 318, the General Court overrode Governor John Lynch's veto. But SB 318 was challenged in court, where the New Hampshire Supreme Court in *Guare v. New Hampshire*, 167 N.H. 658, 669 (2015), struck it down because it violated the New Hampshire Constitution. *Guare* was brought by University of New Hampshire students and LWVNH. The Court rejected the State's argument that, to be domiciled one must also be a resident and ought to obtain a New Hampshire driver's license and vehicle registration, finding unequivocally that, "even though [the students] are not New Hampshire 'residents,' they are entitled to vote in New Hampshire because they are 'domiciled' here." *Id.* at 665. The Court also found that the fact that SB 318's language was "confusing and inaccurate" and "could cause an otherwise qualified

voter not to register to vote in New Hampshire" was further reason to strike it down. *Id.*

182.    Not coincidentally, SB 3 was passed after the GOP re-claimed unified control of the state government in the 2016 General Election, and, once again, the bill imposes burdensome procedural requirements that are particularly difficult for young people to meet. The similarities to *Guare* are striking.

### SB 3 Serves No State Interests

183.    There is virtually no voter fraud in New Hampshire, despite historically high voter turnout. Even if there is a perception that voter fraud exists such that it decreases voter confidence (a scenario that does not hold true given the lack of evidence showing as much), SB 3 will not increase voter confidence. It will instead inhibit, deter, discourage, and prevent qualified potential voters from participating in New Hampshire elections, as demonstrated by the overwhelming testimony against it. There is no evidence that the measures imposed by SB 3 will actually prevent wrongful voting or in any way improve the integrity of New Hampshire elections, and preventing so-called "opportunities" for voter fraud is not a sufficient justification for the myriad ways that SB 3 will disenfranchise qualified New Hampshire voters. Accordingly, SB 3 serves no state interests.

### <u>CAUSES OF ACTION</u>

### COUNT I

### (Violation of Part 1, Article 11 of the New Hampshire State Constitution, by Burdening the Fundamental Right to Vote)

184.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

185.    The right to vote is a fundamental right. The New Hampshire Constitution guarantees that "[a]ll elections are to be free, and every inhabitant of the state of 18 years of age

and upwards shall have an equal right to vote in any election." N.H. Const. Pt. 1, Art. 11. The Constitution provides that "[e]very person shall be considered an inhabitant for the purposes of voting in the town, ward, or unincorporated place where he has his domicile." *Id.*

186.    The court must weigh the character and magnitude of the asserted injury to the voting rights sought to be vindicated against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights. *Guare v. New Hampshire*, 167 N.H. 658, 663 (2015). When those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Id.* When those rights are subjected to "unreasonable" restrictions, the State must "articulate specific, rather than abstract state interests," and must explain "why the particular restriction imposed is actually necessary, meaning it actually addresses, the interest set forth." *Id.* at 667.

187.    The procedural requirements, associated penalties, and incomprehensibility of SB 3 severely and unreasonably burdens the fundamental right to vote of all New Hampshire voters. SB 3 further particularly burdens young voters, low-income voters, minority voters, and voters who have recently moved into or within the State. SB 3 will cause otherwise qualified voters not to register to vote.

188.    There is no governmental interest, let alone a specific or compelling governmental interest, that justifies requiring New Hampshire voters to endure these burdens.

189.    Thus, Defendants have deprived and will continue to deprive Plaintiff, and its members and constituents, of rights secured to them by the New Hampshire Constitution.

## COUNT II

**(Violation of Part 1, Article 11 of New Hampshire State Constitution, by Contradicting the Domicile Qualification)**

190.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

191.    The New Hampshire Constitution enumerates certain qualifications of voters: a voter must be 18, an "inhabitant," and must not have been convicted of certain crimes. N.H. Const. Pt. 1, Art. 11. The New Hampshire Constitution further provides that "[e]very person shall be considered an inhabitant for the purposes of voting in the town, ward, or unincorporated place where he has his domicile." *Id.* The General Court does not have the authority to enact statutes that contradict the voter qualifications set forth in the New Hampshire Constitution. *Op'n of the Justices* ("*Voting Age I*"), 157 N.H. 265, 270–71 (2008).

192.    By requiring a qualified potential voter to undertake one or more "verifiable acts" carrying out their intent to be domiciled and to document such acts to satisfy the domicile qualification, SB 3 contradicts the domicile qualification set forth in the New Hampshire Constitution. The General Court therefore lacked the authority to enact SB 3.

193.    Thus, Defendants have deprived and will continue to deprive Plaintiff, and its members and constituents, of rights secured to them by the New Hampshire Constitution.

**COUNT III**

**(Violation of Part 1, Articles 1, 2, 10, 11, 12, and 14 of the New Hampshire Constitution, by Denying Equal Protection Under the Law)**

194.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

195.    The equal protection provisions of the New Hampshire Constitution in Part 1, Articles 1, 2, 10, 11, 12, and 14 guarantee equal protection under the law. The equal protection provisions of the State Constitution are designed to ensure that State law treats groups of similarly situated citizens in the same manner. *McGraw v. Exeter Region Co-op. Sch. Dist.*, 145

N.H. 709, 711 (2001).

196.    SB 3 classifies and divides similarly situated New Hampshire voters into different groups based on when and where they register to vote, what paperwork they possess, and whether or not they are property owners, and severely and unreasonably burdens voters' fundamental right to vote based upon such classifications.

197.    Defendants have no rational basis or compelling governmental interest to justify unduly burdening New Hampshire voters merely because they register to vote on a particular date or at a particular place, do not satisfy arbitrary and burdensome paperwork requirements, or do not own property.

198.    Thus, Defendants have deprived and will continue to deprive Plaintiff, and its members and constituents, of rights secured to them by the New Hampshire Constitution.

## COUNT IV

### (Violation of Part 1, Articles 1, 2, 10, 11, 12, and 14 of the New Hampshire Constitution, Void for Vagueness)

199.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

200.    The due process provisions and equal protection provisions of the New Hampshire Constitution in Part 1, Articles 1, 2, 10, 11, 12, and 14 protect people from unconstitutionally vague laws that impose penalties without providing people of ordinary intelligence a reasonable opportunity to understand what conduct they prohibit and for authorizing or encouraging arbitrary and discriminatory enforcement. *MacPherson v. Weiner*, 158 N.H. 6, 11 (2008).

201.    The criminal and civil penalties imposed by SB 3 on qualified and domiciled voters who "knowingly or purposely" fail to provide a document to the town or city clerk by an

arbitrary deadline after an election is unconstitutionally vague because the provision does not provide an individual of ordinary intelligence any meaningful guidance as to what activities are subject to the threat of civil and criminal punishment, and it encourages arbitrary and discriminatory enforcement.

202.    Thus, Defendants have deprived and will continue to deprive Plaintiff, and its members and constituents, of rights secured to them by the New Hampshire Constitution.

### PRAYER FOR RELIEF

Accordingly, Plaintiff respectfully requests that this Court enter the following relief:

A.    An order preliminarily enjoining Defendants, their respective agents, officers, employees, successors, and all persons acting in concert with each or any of them from implementing, enforcing, or giving any effect to SB 3 and directing them to maintain the status quo pending the final resolution of this case.

B.    An order declaring that SB 3 violates the New Hampshire Constitution.

C.    An order permanently enjoining Defendants, their respective agents, officers, employees, successors, and all persons acting in concert with each or any of them from implementing, enforcing, or giving any effect to SB 3.

D.    An order awarding Plaintiff its costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to the Court's inherent equitable power, *Claremont Sch. Dist. v. Governor*, 144 N.H. 590, 595 (1999).

E.    Such other or further relief as the Court deems just and proper.

Respectfully submitted,

New Hampshire Democratic Party
By Its Attorneys,
SHAHEEN & GORDON, P.A.


Dated: September 1, 2017                    __/s/ William E. Christie_____
                                            William E. Christie
                                            NH Bar # 11255
                                            S. Amy Spencer
                                            NH Bar #266617
                                            107 Storrs Street
                                            P.O. Box 2703
                                            Concord, NH 03302-2703
                                            (603) 225-7262
                                            wchristie@shaheengordon.com
                                            saspencer@shaheengordon.com